IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>LUIS ENRIQUE SOTO FERRO,<br><br>        Defendants. | ORDER<br><br><br>Case No.  2:07CR11DAK |

This matter is before the court on Defendant Luis Enrique Soto Ferro's Motion to Suppress evidence.  An evidentiary hearing on the motion to suppress was held on September 10, 2007.  Defendant appeared and was represented by Jay W. Spillers.  Plaintiff was represented by Richard D. McKelvie.  The court held closing arguments on the motion on October 17, 2007.  At closing arguments, Defendant was present and both parties were represented by the same counsel.  The court took the matter under advisement.  The court has carefully considered the evidence presented at the hearing, the memoranda submitted by counsel, the arguments made during closing arguments, and the law and facts relating to this motion.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

#### FINDINGS OF FACT

Between ten and eleven in the evening on November 28, 2006, Utah Highway Patrol Trooper Jason Jensen was on routine patrol on I-15 in Washington County, Utah, just north of the Arizona-Utah border.  Jensen was in his vehicle at the cross-over in the highway next to Trooper Robert Nixon, who was in a separate vehicle.  Jensen observed a Honda sedan traveling northbound that had windows that appeared to be tinted beyond that allowed by Utah law.  When it passed by Nixon's headlights, Jensen could not see the occupants through the window. At that same time, Nixon began to pursue a separate, unrelated violator.  Jensen radioed to Nixon and asked him to confirm his suspicion that the windows were illegally tinted.  Nixon did so, and Jensen then pursued the vehicle to initiate the traffic stop.  Jensen also observed that the vehicle had California plates.

For safety reasons, Jensen approached the vehicle on the passenger side and observed that there were two people in the vehicle.  Jensen requested the driver's driver's license, registration, and insurance information.  Neither of the occupants appeared to understand English, and Jensen had difficulty communicating with them.  Jensen then asked for the license and registration in Spanish.  In response, the driver, defendant Ferro-Soto, produced a Mexican driver's license and registration.  Jensen determined that the registered owner of the vehicle was Ruelas Venancio Ferro, and that the owner was not present in the vehicle.

Jensen measured the light transmittance of the passenger window with a light meter, and confirmed that the window was tinted in excess of that allowable by Utah law.  He believes that he was able to get Defendant to understand that the window tint was too dark.

When Jensen had approached the car, he observed a strong odor of air freshener or cologne. While he was talking to Defendant, he noticed that there was only a single key in the ignition. He also found it suspicious that the registered owner was not in the vehicle. Jensen was never convinced that the occupants of the vehicle were legally in possession of it. These observations aroused Jensen's suspicion that the occupants of the vehicle were engaged in illegal activity. In his extensive experience, those factors often point to drug trafficking activity.

Jensen returned to his car and did a records check. The car was not reported as stolen. At about that time, Trooper Nixon, who had been engaged in a separate traffic stop, arrived to assist Jensen. Jensen's impression was that Nixon had better Spanish language skills than did he, though neither of them spoke Spanish well. At Jensen's request, Nixon returned to Defendant his documents and informed him that he was free to go. Nixon then asked Defendant if he would "talk to him for a minute." At that time, Nixon and defendant engaged in an attempt to converse using broken English and Spanish. Because of the Troopers suspicions, Nixon attempted to seek Defendant's permission to search the vehicle.

Unable to communicate with Defendant effectively, the troopers enlisted the assistance of Trooper David Moreno. Moreno was born in Mexico, and raised with Spanish as his primary language. After contacting Moreno and explaining the situation, Nixon asked Moreno to seek consent to search the car. Moreno conversed over the telephone with Defendant, and assured himself that Defendant understood that the car could be searched only with his consent. Moreno was "100% sure" that defendant understood he had the right to withhold consent.[1] Defendant

---

[1] Moreno later came to the scene and spoke to Defendant while the search was taking place. Moreno testified that Defendant did not question the search.

3

consented to a search of the car. Defendant never refused and never tried to limit the search.

After the consent was communicated to the troopers on the scene, Trooper Jensen deployed his narcotics detection dog, Stryker. Stryker, who was certified along with Trooper Jensen by the State of Utah, suddenly jumped through the open passenger window of the car and immediately went to the rear of the vehicle. Jensen testified that he could not distract Stryker from the back of the vehicle. Jensen saw that as an indication that an odor of narcotics was coming from the rear of the car.

Stryker was deployed to the trunk area, where he again indicated. When items were pulled from the trunk, Stryker did not indicate on them. When Stryker was put back in the trunk, he indicated again on both sides of the trunk. The officers took the carpet out and observed a metal sheet bolted in along the rear wall of the trunk to the bumper. A hidden compartment had been made within the rear wall of the trunk and bumper. There were several tupperware containers and Jensen seized a football sized object wrapped in something. Seven containers of methamphetamine were seized from the hidden compartment.

Defendant and his passenger were arrested, and the car was impounded. After his arrest, Nixon transported Defendant to the St. George Police Department. He was interviewed there by Drug Enforcement Administration Special Agent Brandon Holmer. Holmer, who speaks fluent Spanish as a result of two years spent in Argentina followed by several college classes, started the interview by advising defendant of his "Miranda" rights in Spanish. Special Agent Cliff Lark and State Department of Public Safety Agent Rod Elmer were also present. Defendant acknowledged that he understood his rights and then agreed to be interviewed by Holmer without

counsel present. Holmer and Defendant's conversation lasted one to one and one-half hours. At no time did he request counsel, nor did he ever request that the interview be terminated. Defendant did not admit to criminal activity.

**CONCLUSIONS OF LAW**

**I. Legality of Stop and Detention**

A defendant always has standing to challenge the constitutionality of his own stop or detention, and any evidence discovered as the result of an unconstitutional stop or detention generally is suppressed, *see*, *e.g.*, *United States v. Villa-Chaparro*, 115 F.3d 797, 800 (10th Cir. 1997); *United States v. McKneely*, 6 F.3d 1447, 1450 (10th Cir. 1993); *United States v. Erwin*, 875 F.2d 268, 269 (10th Cir 1989). The Court must first determine whether in this case the defendant was subjected to an unconstitutional stop or detention.

The reasonableness of a traffic stop is analyzed under a two-prong analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968). A court must first determine whether the stop was justified at its inception, and second, whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

   *A. Validity of Stop*

The Tenth Circuit has found that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995). As the Supreme Court noted in *Whren v. United States*, 517 U.S. 806 (1996), "the decision to stop a vehicle is reasonable where the police have

probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted).

Moreover, the Tenth Circuit has stressed that "it is not our role to decide whether the present facts are adequate to affirm a conviction under the applicable ... traffic statute," but rather, to "inquire solely as to whether the facts are adequate to form an objectively reasonable suspicion" that the statute was being violated. *United States v. Vercher*, 358 F.3d 1257, 1260 (10th Cir. 2004).

In this case, Trooper Jensen observed a distinct traffic violation – illegal window tinting. This is a Class C misdemeanor under Utah law. *See* Utah Code Ann. § 41-6-12 . Under *Botero-Ospina* and *Whren*, therefore, Jensen's stop of the vehicle was justified at its inception.

   B.  *Scope of Detention*

In addressing the second prong of the *Terry* analysis, whether the detention was reasonably related to the scope of the traffic stop, the Tenth Circuit has recognized that an officer conducting a routine traffic stop may run computer checks on: 1) the driver's license, 2) the vehicle registration, 3) other proof of authorization to operate the vehicle, 4) outstanding warrants on the driver, and 5) whether the vehicle has been reported stolen. *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997); *see United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003). Moreover, an officer may detain the driver and vehicle as long as reasonably necessary to make these determinations or to issue a citation or warning. *Mendez*, 118 F.3d at 1429.

Jensen did not impermissibly detain the defendants or exceed the scope of the stop during the initial detention of the defendants. Jensen was trying to communicate with Defendant's

regarding the window tint and also had to determine Defendants' legal authority to possess the vehicle. When Jensen learned that the vehicle was not stolen and completed the warning for the window tint violation, Nixon returned Defendant's documents to him.

Once Nixon returned Defendant's documents, there is a question as to whether the encounter between the trooper and Defendant became consensual. *See United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). "A stop generally ends when the officer returns the driver's license, registration, and insurance information." *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir. 1990). Additional questioning unrelated to the traffic stop may occur, however, if the detention becomes a consensual encounter. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

As the Tenth Circuit has explained:

> A traffic stop may become a consensual encounter requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave. Therefore, an unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.

*West*, 219 F.3d at 1177 (citations and quotations omitted).

Despite the return of documents, the court cannot conclude that Defendant would have felt free to leave. Nixon testified that he was not actually going to let Defendant go because of the suspicions he and Jensen had regarding illegal activity.

In any event, the evidence establishes that Jensen and Nixon had developed reasonable suspicion that Defendant was engaged in criminal activity. "An investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity that is . . . the officer must acquire a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Villa-Chaparro*, 115 F.3d 797, 801-02 (10th Cir. 1997) (quotations omitted).

In assessing whether Jensen and Nixon could have formed a reasonable and articulable suspicion of criminal activity, this Court is not to base its decision on any one factor, but rather, on the "totality of the circumstances." *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995). Deference is to be given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

> Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

*Id.* (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In developing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations & quotations omitted).

Moreover, in the analysis, it is not appropriate for courts to "pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention." *United States v. Doyle*, 129 F.3d 1372, 1376 (10th Cir. 1997). As such, factors that by themselves are not proof of any illegal conduct may be, when taken together in the aggregate, sufficient to amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see Arvizu*, 534 U.S. at 277 (finding that factors susceptible to innocent explanation may, when taken together, form reasonable suspicion of criminal activity).

In the instant case, Jensen was immediately suspicious of illegal activity. He noted a strong odor of air freshener, which is often used to mask the odor of drugs. He noted that the vehicle had a single key, a circumstance often encountered in drug trafficking. The fact of ownership itself created suspicion. Those circumstances, viewed as a whole, established reasonable suspicion sufficient to detain defendant long enough to investigate the possibility of

9

narcotics trafficking.

**II. Search of the Vehicle**

*A. Standing*

A defendant who moves to suppress evidence has the burden to show, by a preponderance of the evidence, that he was personally aggrieved by an alleged search and seizure. To establish standing, the test is whether "the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000). Important considerations in the expectation of privacy equation include ownership, lawful possession, or lawful control of the premises searched. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978).

To establish standing to challenge the search of a vehicle, a defendant bears the burden of showing he had a "legitimate possessory interest in or lawful control over the car." *Allen*, 235 F.3d at 489. When the defendant is "the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *United States v. Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "Rather, at a minimum, the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.'" *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990)).

In assessing whether a defendant has met his burden, courts have looked to the following factors: 1) whether the defendant asserted ownership over items seized from the vehicle; 2) whether the defendant testified to his expectation of privacy at the suppression hearing, and 3)

whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle. *Hocker*, 333 F.3d at 1208; *Allen*, 235 F.3d at 489.

In applying those factors to the instant case, the record is unclear whether Defendant asserted that he was driving a relative's vehicle. Although the name of the registered owner was similar to Defendant's name, and Defendant's counsel raised the possibility in questioning, Jensen testified that he was never convinced that the occupants of the vehicle were legally in possession of it. Therefore, the record does not resolve whether Defendant had a legitimate possessory interest in the vehicle to establish standing. *See Hocker*, 333 F.3d at 1208; *Allen*, 235 F.3d at 489.

   *B. Consent to Search*

Even though the court concludes that standing has not been resolved, the court will analyze whether the consent to search the vehicle was proper. Consent is an issue of fact to be determined by the court. In *United States v. Soto*, 988 F.2d 1548, (10th Cir.1993), the Tenth Circuit stated: "[t]he voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue." In making the determination, the court should not presume that the consent was either voluntary or involuntary. *United States v. Price*, 925 F.2d 1268, 1271 (10th Cir.1991). To sustain its burden, "the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Soto*, 988 F.2d at 1557 (citing Price, 925 F.2d at 1270).

As a general rule, the Tenth Circuit has found consent to be voluntary when there is no

evidence of coercion and the testimony establishes that consent was freely given, even when a defendant is in custody.

> It appears [the officer] did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further, the incident occurred on the shoulder of an interstate highway, in public view. [The officer] sought permission specifically to look in the trunk, and defendant got out of the car and opened the truck himself. Defendant makes no contention that he misunderstood [the officer's] request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific.

*Soto*, 988 F.2d at 1558 (10th Cir. 1993); *see United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993); *see also United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004) (finding defendant consented because no assertion that officer touched defendant, threatened him, displayed weapon or spoke in an aggressive tone); *United States v. Ramstad*, 308 F.3d 1139, 1146 (10th Cir. 2002) (holding that consent voluntary); *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) (finding consent voluntary because no threats made, no cajoling or demand for consent); *United States v. Anderson*, 114 F.3d 1049, 1064 (10th Cir. 1997) (concluding that consent voluntary because no indicia of coercion).

In *United States v. Orrego-Hernandez* 78 F.3d 1497 (10th Cir. 1996), the Court made the following observation:

> The circumstances of this case, however, are more analogous to *Soto* where we recognized that any detained individual will feel some degree of compulsion but held that detention does not automatically render consent involuntary. 988 F.2d at 1557-58. Here, as in *Soto*, Mr. Orrego-Fernandez was not subjected to an illegal detention. In addition, the district court found the following facts.

> Mr. Orrego-Fernandez was not physically harmed, and no other officers were present when he gave his consent. Trooper Miller did not threaten Mr. Orrego-Fernandez or use a threatening tone. The search was conducted on the shoulder of a public highway in daylight. Trooper Miller asked only once if he could search the truck for guns or drugs. Mr. Orrego-Fernandez got out of the truck after the request to allow Trooper Miller to conduct the search. Mr. Orrego-Fernandez's consent was unequivocal and specific. Under these circumstances, the district court's finding that Mr. Orrego-Fernandez' consent was voluntary is not clearly erroneous.

*Id.* at 1505.

In this case, Defendant was not illegally stopped nor was he illegally detained. He makes no claim that he was physically harmed nor that he was threatened or intimidated in any way. Defendant claims that the officers' multiple requests to search may have caused duress. But there is no evidence that Defendant understood the requests made in English. When confronted with a language barrier, Troopers Jensen and Nixon sought and obtained assistance from a Spanish-speaking trooper, who assured defendant he had no obligation to consent to the search, and that the search would not occur without his consent. Trooper Moreno testified that Defendant asked why the troopers want to search, Defendant considered the request, and then Defendant said that it was "esta bien," which means it is okay. Defendant did not attempt to limit the search, nor did he make any effort to revoke his consent. Therefore, the court finds that the consent was knowingly and voluntarily given.

C. Probable Cause

It is well-established in the Tenth Circuit that an alert by a trained narcotics-detecting dog

is sufficient, without more, to establish probable cause for a search. *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1994), *United States v. Scarbourough,* 128 F.3d 1373, 1377 (10th Cir. 1997). Jensen testified that he and Stryker had been trained and certified in narcotics detection. Jensen also testified that Stryker alerted in the rear of the passenger compartment, indicating the likelihood of contraband in the trunk. That alert took place at a time when reasonable suspicion to detain the vehicle was present, and no physical search of the vehicle took place until after Stryker alerted to the presence of narcotics. Stryker aslo alerted in the trunk itself. When Stryker failed to alert on items removed from the trunk, but continued to alert in the trunk itself, it was reasonable for the officers to search for a hidden compartment.

      *D. Nexus*

Defendant argues that there is no nexus between Defendant and the drugs because Defendant was not the owner of the vehicle. Defendant cites to cases holding that there must be some nexus linking the defendant to the drugs to sustain a conviction. These cases, however, deal with the government's burden at trial. They do not provide grounds for a motion to suppress.

### III. Statements

Defendant asserts that the suppression of statements is no longer an issue.

### CONCLUSION

Based on the above reasoning, the court finds that there are no grounds for suppression of the evidence seized from the vehicle Defendant was driving on November 28, 2006.

Accordingly, Defendant's motion to suppress is DENIED.

Dated this 23rd day of October, 2006.

_____
Dale A. Kimball,
United States District Judge